Next we have Food & Water Watch v. United States Environmental Protection Agency. Next we have Food & Water Watch v. United States Environmental Protection Agency. Good morning. Good morning, Ms. Miller. May it please the Court, Emily Miller on behalf of Petitioners, and I'm going to try to reserve five minutes for rebuttal, please. Very well. This case is about the Environmental Protection Agency denying a request to effectively regulate the significant water pollution from the industrial livestock operations as the Clean Water Act requires. According to the agency's own estimate, roughly 10,000 concentrated animal feeding operations, or CAFOs, are illegally discharging to waterways and have become a major source of unregulated point source pollution. EPA has further admitted that its regulations have proven insufficient to compel Clean Water Act compliance and even stand in the way of effective enforcement. But they came forward and they said, look, what we're going to do is we're going to take our time, we're going to conduct these additional studies, and we're going to try to come up with this holistic plan, is what they're arguing. What's wrong with that? Well, Your Honor, the agency is already on record in a 2022 report in the record at EA 138, ER 138, saying that its regulations are not only failing to address the problem, but they're actually impeding the agency's ability to effectuate the Clean Water Act because they say, quote — And even if all that's right, and I assume that it is, that it is correct, that doesn't tell us what EPA has to do. It says that EPA has to do something, but it doesn't tell us what they have to do. And what EPA said was, we're going to study this a little further and make sure we get this right. That's true. We could force EPA to issue some kind of regulations here and have them — and it turned out that they issue bad regulations and we could chew up a lot more time engaging in arbitrary and capricious review, you know, seriatim here. So, I mean, I'm just wondering, what's arbitrary and capricious about EPA saying, let's do this cautiously and let's get it right the first time? Well, Judge Bybee, what EPA first said is that we're denying your request to initiate a rulemaking. They are not committing at any point to engaging in a rule in the future. They are saying that they're going to continue studying the problem and thinking about it, but that may or may not result in the rule that we've asked for. They haven't told us precisely what they're proposing to do in order to — they're convening certain federal advisory committees providing for other studies, and they said that they've already initiated those things. Now, if those don't result — if the evidence remains the same and EPA refuses to do anything further, then you might well have a strong case for arguing that they've behaved arbitrarily and capriciously. It's very difficult for, I think, for our panel to come in and second-guess the EPA and say this is the wrong use of your resources to study this further. Well, Your Honor, if — what happens is, as you suggest, that they ultimately conclude some years down the line not to engage in a rulemaking, my clients have lost their opportunity to bring that decision before this Court. Now is the point at which this Court can review EPA's continued inaction. Why is that? Well, because they deny this petition, and subject to Section 509 of the Clean Water Act, we have 120 days to challenge that decision. And EPA hasn't committed to making a formal agency action where they decide one way or the other. It could very well be an internal decision that petitioners don't even know the outcome of. And even if we did, there would be no agency action to which we could bring the Court's attention to. And also, Your Honor, I think as we raise in our briefs, the study plans that EPA has proposed are not calculated to result in a fully Clean Water Act compliant program. The detailed study is narrowly focused, as shown in the record at ER 216 to 219, on the effluent guidelines that are applicable to permitted CAFOs. So while they may play a role in improving those standards, they won't address the heart of the problem, which is the widespread failure to permit in the first place. And, therefore, that study shouldn't be used as not a rational basis to delay regulatory revisions related to that problem. Isn't the problem enforcement here? Because you have all these CAFOs allegedly out there engaging in this conduct without the permitting that is needed. But it's the enforcement aspect of this that's the problem. You're right, Judge Mendoza. Enforcement has been a problem for EPA. But they also specifically say, again, at ER 138, that their regulations themselves make it difficult for them to pursue effective enforcement. So they're saying that this problem is persisting not just in spite of their regulations, but because of the regulations. But then that gets to the first point, which was, why isn't what they have decided to do to evaluate the process to conduct their studies and determine perhaps better regulations to address this very point that you raised? If that was their intent, EPA could have granted the petition's general request to update the CAFO regulations to effectuate the Clean Water Act and said we'll not commit to a specific outcome of that rulemaking, but we agree that rulemaking needs to happen. And that's not what they've said, Your Honor. They've said there's a possibility that we will never update this. Are they required to engage in a rulemaking before they have all the information? I mean, are they required to do that first, put that cart before the horse here? Well, Your Honor, as the Court ruled in a community voice where the Clean Water Act gives EPA a clear directive, which here is to regulate CAFO discharges through the point source permit program and authorizes the agency to engage in rulemaking and update rules when necessary to accomplish it, EPA is under, quote, a duty stemming from the statute to update regulations in light of the obvious need. What if the result of EPA's, let's suggest that it's a careful study, is we don't really need to update the regulations. What we really need is another thousand inspectors, and we don't have that in the budget. And so our proposal is we need to go to Congress and make the case to increase the budget so that we have an effective enforcement mechanism of existing regulations. Well, Judge Bybee, EPA does say that it's considering improvements to the current program as in lieu of rulemaking, but that reasoning ignores what's raised in the petition in the briefs, which is the fact that EPA has already tried to do exactly that for decades and without success. The record shows that they've tried to get a thousand more inspectors. Not that specific example, Your Honor, but that they have prioritized improving compliance with an enforcement of their current regulations, elevating CAFO Clean Water Act compliance to a national priority for over 14 years. And during that time, they tried every tool in the toolkit. They pursued enforcement actions. They spent millions of dollars on voluntary incentives and technical assistance. They formed industry and academic workgroups to advance compliance, similar to the subcommittee they announced in the denial, and those efforts failed. And, therefore, it's unreasonable for them to rehash those strategies now to avoid a rulemaking, especially when they haven't explained in the denial why it will somehow be different this time around, and when they're also on record stating that the regulations themselves prevent effective enforcement. And, Your Honor, I think just to EPA's overall point that it lacks information and it needs more information before it can decide whether to update rules at all is unreasonable because of this Court's decision in a community voice, which held that EPA was statutorily required to engage in a needed rulemaking, data gaps notwithstanding, and that the agency could not use uncertainty as an excuse for regulatory inaction that evaded statutory duties. And EPA is trying to do that here, and their reasoning is especially arbitrary in this case because under the Administrative Procedure Act, the agency is also under a legal duty to examine the relevant data. They concede that this is a problem, certainly with the permitting. They concede that point, don't they? They do. They do not dispute the severity of the problem, but they are not saying they're going to fix it with updated, strengthened regulations, and they're saying they need more information before they can reach that just threshold question. What updated regulations would you dictate to EPA? Well, Your Honor, one of the proposals that we put forth in the petition and that we argue in the briefs is specifically focused on EPA's interpretation of the agricultural stormwater exemption and narrowing its interpretation to exclude all CAFO-related discharges from that exemption. And that's something that EPA concedes it has authority to do. And this Court recently recognized in its Food and Water Watch decision that EPA applied that exemption to CAFOs by rule not as a matter of statutory compulsion but out of regulatory discretion. And the only reason EPA gives in the denial for not doing that is that a court has already upheld its current rule, and therefore it must focus on improving implementation of that rule rather than risking an adverse court ruling. But as we argue in our briefs, Your Honor, that's not a reasonable basis for denying the request because the statutory and regulatory history offer clear support for the requested revision, and as we've argued and as the petition puts forward to EPA, EPA has already tried for decades to improve implementation, and if the rule itself is inherently flawed and too problematic to properly implement, then a renewed focus on implementing that flawed rule is unreasonable. And won't they be able to do that in the committees and by the review of the ELG? Well, Your Honor, the affluent guidelines study, again, it's applicable to the standards for permitted CAFOs, and the big problem that we sought to address with the stormwater exemption is that it is allowing unpermitted CAFOs to evade permitting requirements. So the study about the guidelines won't address the issue of permit evasion in the first place. So you want the CAFO owners to be liable for discharges when there is a storm? We want the CAFOs... Absolute liability, whether it's negligence on their part in spreading the manure or whether it's the storm which is sent from some other source. Given Congress's clear intent that they expressed in the statute to regulate CAFO discharges through the Point Source Permit Program and the demonstrated fact that this exemption is allowing CAFOs to skirt that clear requirement, yes, we want EPA to narrow the exemption. No storm exemption, period. Correct. No agricultural stormwater exemption as applied to CAFO-related discharges. And the statutory history supports that request and therefore shows that EPA's fear of an adverse court ruling in the future is unfounded. The history shows that when Congress defined CAFOs as point sources, they were motivated by concern over land application of waste and precipitation runoff, and that 15 years later when the stormwater amendment was passed, they were intending to codify a regulatory carve-out that EPA had tried to create. Isn't that a different problem? Isn't that someone else's problem? It's not EPA's, but it's, you know, Congress clarifying this? Well, Your Honor, it was EPA in the denial that said it's scared of a future court ruling against it if it were to revise its interpretation. So the statutory history showing there is clear support for the interpretation we suggest and request is relevant to showing that that is not a reasonable position for the agency to have taken. They need to show that they adequately considered the relevant problem and offered a reasoned explanation. This is a very, very awkward argument, counsel, to say that it is arbitrary and capricious for EPA to rely on an interpretation of the rule that has been previously approved by another circuit. You're arguing, well, you should have decided something else or you could decide something else. But to argue that it's arbitrary and capricious for you not to change your interpretation that has been court-approved for quite some time is — that's a pretty tough argument to make, and your legislative history argument is pretty weak. Well, Your Honor, the legislative history just shows that EPA could make a change, of course. Okay. But could make a change is very different from arguing that it's arbitrary and capricious for it to fail to change an interpretation that's been court-approved. I understand, Judge Feibe. But what we're arguing is that in the 20 years that have passed since the court approved that interpretation, the record before the agency shows that it's no longer a reasonable one, given that it's enabling widespread permit evasion and that it's based on factual assumptions that are no longer correct. So one of the problems that we identify — Hence the need for a study, counsel. Well, again, Your Honor, the study is focused on effluent guidelines. It's not focused on the agricultural stormwater exemption. And one of the fundamental assumptions that EPA made when it justified that exemption and that it reiterated in its denial at page 226 of the record was that it's reasonable to exempt land application discharges from CAFOs when the waste is applied using plans that are designed to prevent or minimize pollution runoff. And now EPA is on record, most recently in a 2021 CAFO primer document at ER89, saying that even if CAFOs were to perfectly comply with their plans, their standards are insufficient because they're not focused on preventing excess runoff. And as courts have consistently held, for instance, in the American Horse case or the Environmental Health Trust case, when new information comes to light that challenges the factual premise underlying the rule, that constitutes grounds for a petition — evacuating a petition denial unless the agency has adequately explained why, in light of the new information, its regulation remains adequate. And here EPA failed to do that. They failed completely to address the record evidence and their own changed understanding of the — If the regulation were simply a matter of policy, you would have a much better basis. But the problem is, is that it was — it's a reg that adopts a particular view of what the statute means and that's what's been approved by the Second Circuit, reinforced by the Fifth. But the Second Circuit, Your Honor, was analyzing the question in a vacuum, without the record that EPA has in front of it, showing, one, that the fundamental assumptions that the court accepted at the time are no longer holding today, and two, that it is undermining basically the entire statutory scheme of the Clean Water Act by allowing discharging CAFOs to evade permitting. And that's why, now, EPA, with that information in front of it, needs to make a change of course. And the reasons that they've put forward in their denial don't adequately explain why they refuse to do so. Do you want to save the remainder of your time? I would, Your Honor. Thank you. Good morning, Mr. Cervena. Morning. Good morning, Your Honors, and may it please the Court. Paul Cervena on behalf of Respondent U.S. Environmental Protection Agency. I plan to argue for no more than 15 minutes and give the remaining time to counsel for interveners. Your Honors, this petition for review involves one issue, whether EPA arbitrarily and capriciously denied petitioners' petition for rulemaking. Their package of interrelated rulemaking proposals sought to drastically overhaul EPA's Clean Water Act regulations regarding concentrated animal feeding operations, or CAFOs. EPA's decision was that now is not an appropriate time to embark on a time-consuming and resource-intensive rulemaking. Why? Because it... Why? You know the problem. EPA understands the problem, correct? They do. It does. Why isn't it now the time? You don't need additional studies to understand the fact that you need to enforce the permitting process, for example? Well, in response to petitioners' rulemaking, EPA denied the rulemaking because it wanted current research and data from the CAFO detailed study that was already underway and input from a subcommittee with a broad and diverse membership of stakeholders. And it understood that the information that those sources would provide would be very valuable in determining how best to address the challenges presented by the CAFO permitting program. Your friend on the other side said you've done this before and nothing. The problem still remains. Why isn't she right? So EPA is on this right now, that the CAFO detailed study is underway and ongoing, and the subcommittee is underway and ongoing. So those sources are going to be providing the information that EPA needs within a relatively short time period. But EPA hasn't committed to, as a result of that, engage in the new rulemaking, correct? Of course not. No, EPA has many tools to address these problems. They can improve enforcement, they can improve implementation, or they can make a rulemaking. But now it's important to know that the information that they want was not provided by the petitioners in their submission. Part of what the effluent study, or what we call the CAFO detailed study, will include is research on emerging technologies and practices designed to prevent pollutants, including an assessment of the economic achievability of those technologies. And that's important not only for assessing the effluent limitations regulations, but the whole program. Because one of the problems with what's happening is the over-application of manure, litter, and processed wastewater on these fields. And among the technologies that EPA is considering and is gathering information on are those farm equipment with sensors and GPS that can assess the need for and the amounts of the manure, litter, and processed wastewater that should be applied to the fields in real time. So that is obviously relevant to all aspects of the CAFO program. Because the land application and the consistency with the nutrient management plans is really at the centerpiece of what the program demands. So her point that this is something that EPA has studied before, that's incorrect. You haven't been aware of this problem? I think it's fair to say it's an ongoing problem. As of when? Or an ongoing challenge. As of when, counsel? Is this a new thing that's happened over the last year or two? I can't put a date on. I doubt it's the last year or two. No. Okay. So this is a problem that you all have known for a while. And to resolve this, the agency has decided we're going to go forward with this study. Correct? The study is one thing that the agency is doing. Correct. It's more than considering various topics that are on pages. If you want to look at ER 215 and 216, it's going to gather info about CAFO discharges nationwide, about the new technologies and practices and the costs of those, assessments of concentrations in CAFO discharges, and the health of the agriculture industry financially, which goes to the affordability of the new technologies. So that's the CAFO study. It's not just limited to effluent content. Counsel, I have a question that's probably going to be just a little bit obnoxious. But just bear with me, and I'm going to make up some facts. But I suspect that any proposal that comes out from EPA in the future to reform this practice is going to be very controversial. And it's likely to engender a lot of opposition, maybe some controversy in Congress. So one reason that agencies sometimes establish federal advisory committees is to sort of broaden the basis of support for whatever it is that the agency chooses to do. You've chosen a representative group in which you've got lots of input from industry, those who are most likely to oppose any change in these regulations. And that suggests that you may be trying to build some kind of level of consensus that will give you political cover. If what EPA is doing is studying this in order to protect itself from an adverse reaction in Congress, is that arbitrary and capricious for the agency to take that into account? Your Honor, I don't think you've accurately stated the purpose of the stakeholder subcommittee, if we can call it that. It's not a committee of industry. Well, that's why I gave it to you as a hypothetical and told you it was going to be a little obnoxious that I was making up facts. So I want you to assume the facts that I've given you. Is it arbitrary and capricious for an agency to take into account political realities? It may be. I don't think that's what's happening here, and certainly the decision doesn't reflect that at all. I think what's happening, Your Honor, is that EPA is building a record, not only with the CAFO detailed study, but also with the stakeholder subcommittee. All these interested parties from various parts of various groups and perspectives and concerns have been divided into work groups, and they're coming up with their ideas, information, and proposals. The hope is that they'll collaborate on a collective recommendation that EPA will get. I think EPA is more concerned about getting the information that's out there in this nationwide industry, CAFO, and making sure that it adequately understands the problem and can select which of the tools it wants to use to address each of the issues that are in play. A rulemaking is an extremely expensive, time-consuming, and resource-intensive tool to use, and EPA or any agency wouldn't use that tool lightly. And it serves no purpose for the agency to simply do a rulemaking to do a rulemaking because they've got a petition to do a rulemaking when it knows that there's relevant information that's out there that they can access in a relatively short period of time that's going to be very relevant to their decision. And that's what's happened here. Why can't they get that information during the rulemaking process? Well, but then they'd have already decided that there was a rule necessary. Here, they're not sure whether a rule is appropriate or something short of a rule, something less drastic, such as better enforcement, better implementation. Can you address the exception argument? Yes, there were three grounds on which EPA denied to initiate a rulemaking based on petitioners' interpretation of the agricultural stormwater exception. One was this new information that's out there that they can collect that will play into whether a rulemaking is even necessary or whether something else, such as improved enforcement or implementation, will suffice. But in addition, as we pointed out earlier, EPA relied on the Second Circuit decision that had upheld its interpretation. Certainly, that cannot be arbitrary capricious. Now, they're saying that, hey, it's been 20 years or whatever since that decision. There's new information that you all have. That should be sufficient to understand that there's a need to readdress the issue. And that's what's happening. Right now, again, that's what's happening. Detailed KFOA detailed study, stakeholder subcommittee. They're getting the information, and they're in process of getting the information they need to figure out how to tackle these challenges. But the third rationale for denying that aspect of petitioner's petition was that they understated the robustness of the existing regulations. So EPA took issue with that. So there were three reasons why EPA denied petitioner's petition on the agricultural stormwater exemption. On community voice versus EPA, that case involved a very different situation where the court had granted a petition for writ of mandamus, and then EPA did not take action based on what was considered significant data gaps and scientific uncertainty. Now, this case is very different. EPA is considering a rulemaking petition in the first instance, and it has decisionary discretion in that context. And the agency's denial wasn't that there was gaps in the science. As we've discussed, the agency believed that it needed more current data and research before embarking on a rulemaking. You're not giving your co-counsel much time. I think he has some additional time. I thought they had 15 on there when I began. We did. Okay, thank you. In any event, unless there are further questions, I would ask the court to conclude that the agency's action was not arbitrary and capricious and to deny the petition for review. Thank you. Thank you. Good morning, Mr. Chung. Good morning, Judge Mendoza. May it please the Court. David Chung on behalf of the Agricultural Interveners. Judge Bybee, you hit the nail on the head. It is not arbitrary and capricious for EPA to refuse to change its longstanding interpretation of the agricultural stormwater exclusion in denying the petition. Applying the extremely limited and highly deferential standard of ARU applicable to denials of rulemaking petitions, EPA's decision to stand by its interpretation at this time, which the Second Circuit upheld in a nationally binding decision, should be affirmed. EPA's longstanding interpretation harmonizes two parts of the same statutory definition of point source. The statute explicitly includes concentrated animal feeding operations while explicitly excluding agricultural stormwater discharges. After considering the Clean Water Act's text, history, and purpose, the Second Circuit in the Waterkeeper decision found that EPA's interpretation comports with Congress's intent. The Court looked to dictionary definitions at the time that Congress enacted the exclusion in 1987 and said those dictionaries define agriculture to include raising livestock, which CAFOs indisputably do. The Second Circuit also emphasized to Judge Bea's point that when Congress enacted the exclusion, it was affirming the impropriety of imposing liability for agricultural-related discharges triggered not by negligence or malfeasance but by the weather, even if those discharges come from what are otherwise point sources. Notably, even before the Second Circuit decided Waterkeeper, courts considering whether discharges from CAFO land application areas can be excluded from permitting as agricultural stormwater discharge took essentially the same approach. These are cases that petitioners cite in their own briefs. Cases, for example, like concerned area residents for the environment versus Southview Farm, cited on page 25 of the petitioner's reply brief. In that case, the Court noted, because Congress mandated comprehensive regulations of certain forms of industrial and municipal stormwater runoff under 33 U.S.C. 1342P, one can infer that Congress wanted to make clear agriculture was not included in this program. Key to that court's analysis was whether the discharges in question occurred during rainfall or whether they were mixed with rainwater during or, sorry, it's not whether the discharges occurred during rainfall or were mixed with rainwater, but rather whether the discharges were the result of precipitation. Similarly, in another case that petitioners cite, Community Association for Restoration of the Environment versus Sid Koopman Dairy, cited on 48 of their opening brief, that court likewise said, the agricultural stormwater exclusion does not relieve CAFO farmers from liability for over-application or mis-application that results in discharges. But notably, the court did not say, discharges from land application areas related to a CAFO always require a permit. Quite the contrary, citing Southview Farm, which we just discussed, the court said there remain genuine issues of fact regarding the extent to which defendants' lands are point sources. That outcome makes no sense, Your Honors, if discharges from CAFO land application areas were categorically ineligible for the exclusion, as petitioners suggest. Petitioners seek to get a lot of mileage out of their assertions that the record shows there is widespread evasion from permitting by CAFOs and that there are widespread discharges. For example, they repeatedly note that 10,000 CAFOs are unlawfully discharging without a permit. The reality is those are estimates that are outdated from a 2008 rulemaking where EPA roughly said that it thinks that 75% of CAFOs meet the now-defunct proposed discharge standard.  Our number? So respectfully, Judge Mendoza, we don't have a real number, and that is why EPA is studying the problem. So their number is wrong, but we don't have a number. Is that your answer? We don't know precisely. We know that there's no dispute that there are unpermitted CAFOs. The MPDES permit inventory and the excerpts of records show that there are, in fact, CAFOs without permits. The study that EPA has designed calculated to get a number? Correct, Your Honor. So if you look at ER-218 and ER-221, EPA is very candid. It says the data on actual discharges from CAFOs is very sparse. ER-218 specifically says it only has data from 16 CAFOs. So there's a lot of supposition here, and we respectfully submit that that's not a good basis to force EPA to completely detonate a statutory exclusion. EPA is looking into the number of CAFOs that are actually discharging without a permit. And another final point is any figure that relates to CAFOs that are purportedly discharging without a permit is not confined to just whether discharges are happening at land application areas. Any prior estimates from EPA are aimed at both the production area and land application areas. So again, the preferred outcome in this case that petitioners want you to force EPA to undertake, which is completely redo the exclusion, is disproportionate to the problem that they claim. All right, thank you, counsel. Hold on. Are there any other questions? Any other questions? No. All right, thank you for your time. We appreciate it.  I'd like to make three brief points, but first I'd like to correct something Intervenors Council just said about how the study will be defining how many CAFOs are discharging without permits. Nowhere in the study announcement in the record at ER 216 and 219 does it say it's going to be trying to figure out how many CAFOs without permits are discharging. But to the government's counsel... they're trying to see the extent to which CAFOs are discharging so as to figure out what effluent guideline standards they need to potentially strengthen within permits. So this is all within the universe of permitted CAFOs, the study. And to EPA's earlier arguments about lack of information and how that provides a reasonable basis for the denial, Community Voice forecloses that. Community Voice found that lack of information is not an excuse to evade statutory duties or... Right. If you've got a statutory duty... I mean, one of the things that sort of bothers me about the whole posture of this case is this is very close to a petition for mandamus. And what you've asked to do is to order EPA to issue a rule. The funny thing about that is usually when we get a petition for mandamus, it's because there's some duty that an agency must undertake and that it is clear that it has failed to do. And here, your order is you've got to issue a rule. We have no idea what that rule might be, but you have to issue a rule. If EPA issued the wrong rule, it would satisfy what you've requested here. And that just doesn't seem that it makes a lot of sense for us to issue what looks like a writ of mandamus to issue a rule that has no particular content to it. Well, Judge Bybee, respectfully, I disagree. We are not asking you to order EPA to issue a rule. We are simply asking for a remand and for EPA to reconsider the petition consistent with its obligations under the Clean Water Act and the Administrative Procedure Act. So if EPA were to reconsider the petition... Wait. You're just asking EPA to reconsider things? Correct, yes. That is the relief we're requesting here. And it's narrow understanding the deferential standard here. And I do understand that a community voice arose out of a minute. But if EPA just came in and just issued the same letter all over again, said, well, we just think we need to study it, that would satisfy your concern? Well, Your Honor, if EPA were to actually comply with its Clean Water Act and Administrative Procedure Act obligations in replying to the petition, we're confident that the answer would be that a rulemaking is warranted. And that's all we're seeking. We're just seeking their reconsideration here. Did you request EPA to reconsider this? Well, that is the relief we requested of this Court, yes. Did you request EPA to reconsider this? Is this a petition from a denial by EPA of a motion for reconsideration? No, Your Honor. This is a petition to review the denial itself. And the relief that we've requested is just that EPA reconsider its denial, consistent with its obligations. That's a very, very odd request. Well, Your Honor, that is the normal relief that is available to petitioners in this type of... Well, in this context, but this is a very awkward context, I think. I understand, Your Honor. When EPA has said, we're not denying this, we agree there's a problem, there's some things here that we're not doing as well as we could be, let's figure out what the right thing to do is. And you've come in and said, no, Court, order EPA to do something different. Well, Your Honor, if EPA came back with a different response that said, this is a problem, we agree, we are going to figure out exactly what regulatory updates we're going to make, but we will make updates, then that would be a sufficient... But that might be an irresponsible answer. That might be an unreasonable answer from EPA because the answer could be, the current system that we have is flawed, but we can't design a better system. And so what we really need is 10,000 more inspectors to enforce the rules that we currently have in existence. That would be — that would be — that would not be arbitrary and capricious for EPA to come up with something like that. But we've got to stand back and give the agency the room to do what it's supposed to do. And if that is their answer and they adequately explain it and justify it in the record, then that is the answer. But, Your Honor, this petition response was not adequately explained or justified. Demanding that they give that answer at this time when what they've said is, we need some additional time and space to study this. We've designed a study. We've got things underway. And we will have some results in some reasonable time period in the future. It just doesn't sound arbitrary and capricious. Your Honor, I would also note, though, that we're not expecting the agency to turn around another response immediately. It took them seven years to answer this outstanding petition. And they will have been conducting these studies during the time. There just needs to be a sufficient hook to bring it back to the Court's attention should their response continue to be arbitrary and capricious. And right now, there is — that does not exist. And, Your Honor, I would like to — Hold on. I think you are over time. If you would like to — do you have another question? If you want to make your final point, Counsel. Your Honor, I would just conclude by saying that, again, all we're asking for is a remand and reconsideration. EPA has already spent seven years, when it could have been taking its statutory mandate seriously, not responding and not thinking about it, and now wants some undefined amount of time to continue thinking rather than acting. And all we want is a remand and reconsideration, consistent with their Clean Water Act and Administrative Procedure Act obligations. Thank you. Thank you. I want to thank both — all three, Counsel. Thank you very much for your arguments today. Food and Water Watch versus United States Environmental Protection Agency will be submitted at this time.
judges: BYBEE, BEA, MENDOZA